## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN HOSPICE MANAGEMENT HOLDINGS, LLC et al.,[1] | Case No. 16-10670 (___) |
| Debtors. | Joint Administration Requested |

### DECLARATION OF SCOTT MAHOSKY IN SUPPORT OF FIRST DAY MOTIONS

I, Scott Mahosky, hereby state and declare as follows:

1.      I am the Chief Executive Officer of American Hospice Management Holdings, LLC and each of the other debtors and debtors-in-possession (collectively the "Debtor" or "American Hospice").  I am generally familiar with the day-to-day operations, business and financial affairs and books and records of the Debtor.

2.      I am an experienced senior business leader with over 26 years of business experience.  I have experience as a CEO and CFO.  I have focused on healthcare businesses in the last five (5) years.  I graduated from college in 1989 and obtained an MBA in 1992.

3.      On the date hereof (the "Petition Date"), each Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

4.      To enable the Debtor to minimize the adverse effects of the commencement of this Chapter 11 Case on its business, the Debtor has requested various types of relief in a number

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: American Hospice Management, LLC (4237), Hospice of Central Virginia, LLC (6612), Embracing HospiceCare, LLC (2674), Embracing HospiceCare of South Atlanta, LLC (2689), American Hospice Management Holdings, LLC (2689), Frontier Hospice, LLC (0349), Hospice of New Jersey, LLC (9123), FMC Hospice - Conroe, LLC (8960), FMC - Deep East Texas, LLC (8614), Hospice of Arizona, LLC (1618), and Hospice of Pennsylvania, LLC (9749).  The Debtors' headquarters is located at 50 North Laura Street, Suite 1800, Jacksonville, Florida 32202.

of applications and motions (each a "First Day Motion" and collectively the "First Day Motions"). The First Day Motions seek relief intended to maintain the Debtor's business operations to preserve value for the Debtor, its stakeholders and parties in interest. Each First Day Motion is crucial to the Debtor's reorganization efforts.

5.      I make this declaration in support of the First Day Motions. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion. The facts set forth in this declaration are personally known to me, and, if called as a witness, I could and would testify thereto.

## I.  BACKGROUND

### A.      The Debtor's Business

6.      American Hospice is a national hospice company founded in 1992 with its corporate headquarters in Jacksonville, Florida. American Hospice is one of the most respected hospice care providers in the United States providing end of life care with dignity and comfort to patients. American Hospice provides care for patients with conditions including, among other things, cancer, cardiopulmonary diseases, Alzheimer's and strokes. Over 90% of the revenues of American Hospice are derived from Medicare with the balance being private pay and Medicaid.

7.      American Hospice currently provides hospice care in the following six (6) markets: (i) Phoenix, Arizona; (ii) Houston, Texas; (iii) Oklahoma City, Oklahoma; (iv) Atlanta, Georgia; (v) Richmond and Central Virginia; and (vi) New Jersey.

8.      In its six (6) markets at any one time, American Hospice is currently providing care to approximately 600 patients on a daily basis. Most of the services are provided in the home or in skilled nursing facilities although American Hospice also operates one (1) in patient care unit in Virginia.

9.      Prior to bankruptcy, American Hospice has been focused on upgrading its

management team, improving its compliance policies and procedures, streamlining its operations and improving its sales team.

10.     Currently, in addition to myself, some of the senior officers in American Hospice include: Don Borchert, Chief Financial Officer and Kathi Cordingley, Chief Compliance Officer.

11.     American Hospice executed a corporate integrity agreement in March 2013 with the U.S. Department of Health and Human Services Office of Inspector General ("OIG") and is in compliance with that agreement.  The Debtor entered into this agreement at the request of the OIG to promote compliance with all medicare, medicaid and other federal health care program laws and regulations.

12.     In 2015 on a consolidated basis American Hospice had gross revenue of approximately $57 million, gross expenses of approximately $61 million and EBITDA of negative $4.7 million.

13.     Currently, the Debtor has 365 total employees, 307 of whom are full-time employees and 57 of whom are part-time employees.

14.     Each of the Debtors is owned 100% by American Hospice Management Holdings, LLC which is a Delaware limited liability company.  The majority owner of American Hospice Management Holdings, LLC is American Hospice Holdings Corporation, a Delaware corporation.  American Hospice Holdings Corporation is wholly owned by 2000 Riverside Capital Appreciation Fund, L.P. ("Riverside").

**B.      The Pre-Petition Sales Process**

15.     American Hospice engaged Harris Williams & Co. ("HW") to market the company for sale in March of 2013.  HW prepared a confidential information memorandum and contacted over 100 strategic and financial buyers.  HW has been actively marketing the company

for sale since 2013.

16.    In 2013 after an extensive marketing effort, no party was interested in proceeding with a transaction with the Debtor due to the recency of the settlement with the government . In 2014 and early 2015, HW had discussions with two (2) strategic buyers who had participated in the 2013 process but ultimately neither party was interested in consummating a transaction. In mid-2015, HW approached 28 financial and strategic buyers but none were willing to proceed with a transaction outside of the protection of a bankruptcy process. Finally, in 2016, HW contacted 12 financial and strategic buyers regarding interest  in serving as a "stalking horse" in a 363 sale and two (2) expressed interest. Ultimately, one (1) party, Hospice Partners of America, LLC submitted a letter of intent to buy the Debtor's business in Virginia and Texas. A number of other parties indicated that they did not have an interest in serving as a "stalking horse", but would be interested in participating in a 363 auction.

17.    Prior to the Petition Date, American Hospice entered into agreements with several members of the Debtors' key management pursuant to which American Hospice agreed to make certain bonus payments to key management members conditioned on the successful completion of a sale transaction relating to the Debtors (the "Prepetition Bonus Agreements"). In the Prepetition Bonus Agreements, key management members agreed to release any and all claims against the Debtors as a condition of the receipt of any payments under the Prepetition Bonus Agreements. Prior to the Petition Date, Riverside agreed to guaranty some or all of the payments to key management members due under the Prepetition Bonus Agreements in the event the Debtors did not satisfy their obligations under those agreements.

**C.    The Debtor's Existing Debt Structure**

18.    American Hospice owes approximately $8 million of secured debt to Riverside which has a blanket lien on all assets of the Debtor. Riverside acquired this debt from BMO

Harris Bank, N.A. in March of 2016.

19.      American Hospice owes approximately $4.2 million of unsecured debt owed to trade vendors; $5.5 million of debt owed to the DOJ and $1,034,040 owed to Palmetto GBA the intermediary for the Centers for Medicare and Medicaid Services ("CMS"); and $11.7 million owed to American Hospice Holdings Corporation who acquired certain senior subordinated debt in December of 2015.  American Hospice also owes monthly rent of approximately $315,000  to landlords on twenty (20) properties leased by the Debtors.  Eight of the twenty (20) properties are not currently being used by the Debtors.

**D.      The Necessity for an Expedited Post-Petition Sale**

20.      American Hospice is under severe financial distress.  The Debtor has been losing money for a number of years.  Over the past few years its revenue and EBITDA has declined precipitously.  The Debtor is operating with very tight working capital.  The business the Debtor is in is heavily regulated.  The Debtor is currently not profitable and its liabilities vastly exceed its assets.

## Chapter 11 Initiatives

21.      The management of the Debtor, after a thorough and deliberative process, has authorized the Debtor to commence this bankruptcy case for the purpose of preserving and maximizing the value of the Debtor's assets for the benefit of the Debtor's stakeholders and parties in interest and to ensure proper care of patients.

### Sale Process

22.     The Debtor anticipates that this Chapter 11 Case will involve a sale of substantially all of the Debtor's significant assets pursuant to Section 363 of the Bankruptcy Code on an expedited basis, through an auction process approved by the Bankruptcy Court.

23.     Before filing this Chapter 11 Case, the Debtor—with the aid of HW—initiated a focused marketing process to explore a range of strategic financing and sale options for the Debtor's various business units.   After careful evaluation and further negotiation with the Debtor's stakeholders, it was determined that an expedited free-and-clear sale of the Debtor's business through a chapter 11 proceeding would best preserve the underlying value of its operations and maximize the value of the Debtor's assets for the benefit of the Debtor's creditors and stakeholders.

24.     Under the requirements of the Debtor's debtor-in-possession financing, further described below, the Debtor is required to file a sale procedures motion within three days after the Petition Date.   The Debtor is in the process of finalizing that motion, and anticipates that it will include a draft asset purchase agreement with Hospice Partners of America, LLC, pursuant to which the Debtor expects that Hospice Partners of America, LLC will make a stalking horse bid for the Debtor's operations in Texas and Virginia subject to higher or better offers.

25.     As will be further detailed in the sale motion, the Debtor's proposed sale process requires a closing no later than April 30, 2016.

26.     While the Debtor understands that the timeline for the marketing and sale of its assets is aggressive, the Debtor believes that it reflects the constraints of the case and is appropriate under the circumstances.   The Debtor, in its business judgment, believes that the marketing and sale of its assets pursuant to the proposed sale process presents the best opportunity to maximize the value of its assets for all interested parties.

### **Debtor-in-Possession Financing**

27.     The Debtor has secured additional debtor-in-possession financing from Hospice Partners of America, LLC ("DIP Lender") in connection with its bankruptcy filing. Without such additional financing, the Debtor believes that its operations will cease in the near term, resulting in significant loss of value to all of its stakeholders and parties in interest. With such additional financing in place, however, the Debtor believes that it can continue operations through the contemplated sale process. Consistent with these plans, the Debtor has presented a nine-week budget cash projection to the DIP Lender.

28.     During the sale process, the Debtor intends to continue normal operations as it completes its operational and financial restructuring for the benefit of its creditors, stakeholders, patients and all other parties in interest.

## II.  **FIRST DAY MOTIONS AND APPLICATIONS**

29.     Concurrently with the filing of its Chapter 11 petition, the Debtor is filing certain applications, motions, and proposed orders. The Debtor requests that the relief described below be granted, as each request constitutes a critical element in achieving the successful rehabilitation and restructuring of the Debtor for the benefit of all parties in interest.

30.     Concurrently with the filing of this Chapter 11 Case, the Debtor filed the First Day Motions, which request various forms of relief. Generally, the First Day Motions have been designed to meet the Debtor's goals of:  (a) no disruption in patient care; (b) continuing its operations in Chapter 11 with as little disruption and loss of productivity as possible; (c) maintaining the confidence and support of its employees, vendors, suppliers and service providers during the Debtor's reorganization process; (d) establishing procedures for the smooth and efficient administration of this Chapter 11 Case; and (e) obtaining the necessary financing through cash collateral usage and a debtor in possession loan to finance the Debtor's operations

during this Chapter 11 Case.

31.    I have reviewed and discussed with Debtor's counsel each of the First Day Motions filed contemporaneously herewith (including the exhibits thereto and supporting memoranda) and incorporate by reference any factual statements set forth in the First Day Motions. It is my belief that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve the goals of this Chapter 11 Case.

32.    It is my further belief that, with respect to those First Day Motions requesting the authority to honor prepetition obligations, the relief requested is essential to the Debtor's chapter 11 initiatives and necessary to avoid immediate and irreparable harm to the Debtor. Any diminution in the Debtor's ability to maintain its operations in the ordinary course will have an immediate and irreparable harmful effect on the going concern value of the Debtor's estate to the detriment of all of the Debtor's constituencies.[2]

## A.    Motion to Approve Debtor in Possession Financing ("DIP Motion")

33.    By the DIP Motion, the Debtor seeks the entry of interim and final orders (i) authorizing the Debtor to obtain postpetition financing (the "DIP Financing") pursuant to that certain *Senior Secured, Superpriority Debtor-In-Possession Credit Agreement* (as it may be amended from time to time, the "DIP Agreement") and the related DIP Budget; (ii) authorizing the Debtor to use Cash Collateral; (iii) granting liens and providing superpriority administrative expense status to the DIP Lender; (iv) granting adequate protection to the Prepetition Secured Parties; (v) modifying the automatic stay; (vi) scheduling a final hearing on the relief requested herein; and (vii) granting related relief.

34.     As set forth in the DIP Motion, the Debtor, in its reasonable business judgment, seeks $500,000 in post-petition financing.  On an interim basis the Debtor would seek $250,000 of the $500,000.

35.     Upon entry of the Final Order, the Debtor will draw additional funds available under the DIP Financing in accordance with the terms of the DIP Agreement, in order to fund the Debtor's operations during this Chapter 11 Case.

36.     The Debtor is cash-strapped and has an immediate need to access the funds available under the DIP Financing.  Without the DIP Financing the Debtor would be unable to pay costs and expenses, including but not limited to, wages, salaries, professional fees, and other general administrative expenses and costs that will arise in connection with the administration of a Chapter 11 Case and in the ordinary course of the Debtor's business.  The Debtor has no other credit available, and without the additional liquidity provided under the DIP Financing the Debtor will run out of cash before the end of March 2016 and cease operations.

37.     Despite the Debtor's extraordinary circumstances, it made a good faith effort to explore all available financing options.  However, the Debtor's obligations owed to Riverside are secured, in whole or in part, by all of the Debtor's assets, and therefore, (i) the liens of Riverside would have to be primed to obtain postpetition financing, (ii) the Debtor would have to find a postpetition lender willing to extend credit that would be junior to the liens of Riverside or (iii) postpetition financing would have to be extended on an unsecured basis.  The Debtor recognizes that few other DIP lenders, if any, would be willing to lend under the circumstances.  The Debtor explored other financing alternatives but those efforts were unsuccessful.

38.     After extensive negotiations, Riverside has consented to the priming of their

---

[2]  Unless otherwise defined herein, any capitalized term used herein shall have the meaning ascribed thereto in the
*(footnote continued on next page)*

liens in accordance with the terms described in the DIP Motion and DIP Agreement. Consequently, the Debtor was able to obtain the DIP Financing from the DIP Lenders on a senior secured, superpriority basis under section 364 of the Bankruptcy Code as set forth in the DIP Agreement, and only on such terms. The Debtor and its professionals believe that the DIP Financing is comparable to postpetition financings obtained by companies similar in size to the Debtor, particularly with respect to pricing and fees. The terms and conditions set forth in the DIP Agreement were extensively negotiated—in good faith and at arms' length—by the Debtor and its professionals on the one hand, and the DIP Lenders and their professionals on the other hand.

39.    The success of the Debtor's Chapter 11 Case depends in large part on maintaining and/or restoring marketplace and employee confidence and maintaining the operation of its business. As a result, the Debtor needs immediate access to the DIP Financing in order to, among other things, permit the orderly operation of its business by timely procuring and paying vendors, employees and other operational costs. In addition, the DIP Financing will give the Debtor's counterparties confidence that it will continue to meet its obligations in the ordinary course of business. Accordingly, the Debtor believes that such financing, coupled with the use of cash collateral, will enable it to stabilize operations during this Chapter 11 Case.

40.    Moreover, given the lack of any alternative capital and funding, the Debtor submits that it will face immediate and irreparable harm in the absence of the relief requested in the DIP Motion. Indeed, without the liquidity provided under the DIP Financing the Debtor will be forced to immediately shut down operations. The Debtor believes that the DIP Financing, made available pursuant to both the interim and final orders, will provide sufficient capital and

---

particular motion described below.

liquidity to fund its operations during this Chapter 11 Case. Further, under the circumstances, the Debtor believes that the terms of the DIP Financing are fair and reasonable and represent the best—and perhaps the only—financing available to the Debtor.

41.     I believe that the relief requested in the DIP Motion is in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this Chapter 11 Case, and is critical to the Debtor's reorganization efforts. Accordingly, on behalf of the Debtor, I respectfully submit that the DIP Motion should be granted.

**B.     Motion for Authorization to Continue Using Existing Centralized Cash Management System and Maintain Existing Bank Accounts ("Cash Management Motion")**

42.     By the Cash Management Motion, the Debtor seeks entry of an order (i) authorizing (a) the continued maintenance of existing bank accounts, (b) the continued use of the Debtor's existing cash management system, (c) the continued use of existing business forms, and (d) the opening and closure of bank accounts as deemed necessary and appropriate in the Debtor's business judgment, and (ii) waiving the requirements of section 345(b) of the Bankruptcy Code.

43.     As of the Petition Date, the Debtor used straightforward, independent cash management systems to collect, transfer, and disburse funds generated by its operations and to accurately record all such transactions (collectively, the "Cash Management System") in the ordinary course of business. The Debtor's Cash Management System involves an integrated network of separate accounts to manage and control receipts and disbursements. The Cash Management System is centralized at the Debtor's corporate offices and allows the Debtor, through the use of accounting software, to track its cash balances on a daily basis. The Debtor's Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and scope. The Debtor's Cash Management System enables the Debtor's

management to quickly and accurately create reports on the status, location and availability of funds and helps to facilitate the movement of such funds. Accordingly, the Debtor believes that its Cash Management System—though critical to the successful operation of its business—is straightforward and can be easily monitored by the Debtor, its professionals, and the U.S. Trustee during this Chapter 11 Case.

44.    Specifically, in the ordinary course of business, each Debtor maintains bank accounts with Wells Fargo Bank, consisting of a Deposit Account and a Disbursement Account and American Hospice Management Holdings, LLC also has a Sweep Account. Each Debtor maintains a deposit account into which its revenues are deposited. The monies are then swept to a holding company account. When disbursements needs to be made, the monies are then sent back to each Debtors disbursement account. The Debtor believes that each of its Bank Accounts is maintained at a stable financial institution.

45.    As part of its Cash Management System, the Debtor uses a variety of checks and other pre-printed business forms. Because of the nature and scope of the Debtor's business operations and the number of suppliers of goods and services with whom the Debtor transacts on a regular basis, it is important that the Debtor be permitted to continue to use its Business Forms without alteration or change. To avoid disruption of its Cash Management System and unnecessary expense, the Debtor requests that it be authorized to continue to use its Business Forms substantially in the forms existing before the Petition Date, without reference to its status as a debtor-in-possession; provided, however, that once the Debtor's existing checks have been used the Debtor will reorder checks with the designation "Debtor-in-Possession" and the corresponding bankruptcy case number on all such checks. In the absence of such relief, the estate will be required to bear a potentially significant administrative burden and expense.

46.     In sum, the Debtor's Cash Management System allows for (i) overall corporate control of funds, (ii) cash availability when and where needed by the Debtor, and (iii) the reduction of administrative costs through a method of coordinating funds collection and movement.    Further, the Cash Management System will enable the Debtor to continue to maintain detailed records reflecting all transfers, receipts, and disbursements.    The Debtor's smooth transition into, and through, chapter 11 depends on its ability to use its Cash Management System, maintain its Bank Accounts, and use its existing Business Forms without interruption.    Indeed, the Cash Management System is essential to the efficient execution and achievement of the Debtor's business objectives and ultimately, to maximizing the value of the Debtor's estate.    In light of the foregoing, the Debtor believes that requiring it to adopt a new, segmented cash management system at this early and critical stage of this Chapter 11 Case would be an unnecessary financial and administrative burden, detrimental to the Debtor's estate and creditors.

47.     I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this Chapter 11 Case, and is critical to the Debtor's reorganization efforts.    Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be granted.

**C.    Motion for Entry of Interim and Final Orders (i) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtor and (ii) Determining that the Utility Companies are Adequately Assured of Postpetition Payment ("Utilities Motion")**

48.     By the Utilities Motion, the Debtor seeks entry of interim and final orders: (i) prohibiting Utility Companies from altering, refusing or discontinuing services to, or discriminating against, the Debtor as a result of the commencement of this case or on account of prepetition invoices, (ii) approving the Debtor's proposed form of adequate assurance, and (iii)

13

establishing procedures for resolving adequate assurance objections by Utility Companies.

49.    In the ordinary course of its business, the Debtor incurs expenses in connection with certain Utility Services including gas, electric, and other similar services. On average, the Debtor pays approximately $66,000 each month to Utility Companies.

50.    The Utility Services are essential to the Debtor's business; any service interruption would severely disrupt the Debtor's operations and could harm customer relationships, revenues, profits, and ultimately its ability to maximize stakeholder recoveries in this Chapter 11 Case. It is therefore critical that all Utility Services continue to be provided on an uninterrupted basis to the Debtor. Consequently, the Debtor intends to pay all postpetition obligations owed to the Utility Companies in a timely manner using operating revenue and in accordance with the DIP Budget.

51.    However, due to the timing of the filing of this Chapter 11 Case in relationship to the Utility Companies' billing cycles, and the Debtor's financial situation leading to the filing of this Chapter 11 Case, the Debtor has been invoiced, but has not yet paid, for certain prepetition Utility Services. In addition, the Debtor may have incurred utility costs for services provided since the end of the last billing cycle that have not been invoiced to the Debtor. The Utilities Motion seeks to preserve the protections that the Utility Companies have under section 366 of the Bankruptcy Code, while affording the Debtor an opportunity to provide and negotiate adequate assurances without facing the threat of immediate termination of its Utility Services. In particular, the Debtor requests approval of certain procedures that balance the protections afforded Utility Companies and the Debtor's need for uninterrupted Utility Services.

52.    Further, the Debtor respectfully submits that none of the Utility Companies requires a deposit for the provision of Utility Services to the Debtor during the postpetition

period of this case given the modest cost of the Utility Services and the availability of funds pursuant to the DIP Agreement and Budget. Nevertheless, the Debtor proposes to pay an adequate assurance deposit to each Utility Company in an amount equal to the two-week average charge for Utility Services provided by each Utility Company. The Debtor submits that the foregoing constitutes adequate assurance of future payment to the Utility Companies to satisfy the requirements of Section 366 of the Bankruptcy Code; however, the Utilities Motion provides a mechanism through which Utility Companies may request additional adequate assurance.

53.     Based on the foregoing, I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this Chapter 11 Case, and is critical to the Debtor's reorganization efforts. Accordingly, on behalf of the Debtor, I respectfully request that the Court grant the relief requested in the Utilities Motion.

D.     **Motion for Authorization to Pay Pre-Petition Wages, Compensation, and Employee Benefits ("Wages Motion")**

54.     By the Wages Motion, the Debtor seeks interim and final orders (i) authorizing, but not directing, the Debtor to pay the prepetition wages, salaries, and benefits of its employees; (ii) authorizing, but not directing, the Debtor to continue employee benefit programs in the ordinary course of business; and (iii) authorizing and directing all banks to honor prepetition checks for payment of prepetition wage, salary and benefit obligations.

55.     As of the Petition Date, the Debtor employs approximately 365 employees (the "Employees"). The average gross bi-weekly-monthly payroll historically is approximately $1 million. The next scheduled payroll date is on or around March 25, 2016. All Employees are paid through a payroll service. The Debtor estimates that the aggregate amount of the Employees' prepetition accrued, unpaid wages and commissions as of the Petition Date will not

exceed $1 million (the "Prepetition Wages Cap"). Pursuant to the Wages Motion, the Debtor will not make payments to the Employees for prepetition accrued, unpaid wages and commissions in excess of the Prepetition Wages Cap. Moreover, the Debtor does not believe payments of wages to any individual employee will exceed the $12,475 cap under section 507(a) of the Bankruptcy Code.

56.     In addition to the wages discussed above, the Debtor's Employees also generally are entitled to receive other forms of compensation, including health benefits, vacation pay, paid holidays, paid sick time, and other earned time off, and reimbursement of certain business expenses (collectively, the "Employee Benefit Programs"). The Employee Benefit Programs include, but are not limited to: (i) paid time off benefits, (ii) expense reimbursement for certain employment-related activities, (iii) 401(k) and similar retirement investment plans, (iv) a healthcare program, including dental and vision coverage as well as several insurance options, and (v) workers' compensation insurance. Certain of these Employee Benefit Programs are funded by the Employees themselves through payroll deductions or a combination payroll deductions and contributions from the Debtor. Further, as set forth in the Wages Motion, the Debtor proposes that all payments to Employees in connection with the Employee Benefit Programs be made subject to both the DIP Budget and any applicable payment cap.

57.     The Debtor believes that many, if not most, of its Employees rely exclusively on their compensation to pay their daily living expenses. Also, the Employee Benefit Programs are a critical component of the Employees' total compensation package. Absent the relief requested in the Wages Motion, the Employees could face significant financial difficulties. Furthermore, if the Debtor is not permitted to make the payments proposed in the Wages Motion, the Employees' morale will suffer, and worse, certain Employees may seek alternative employment.

Any loss in workforce at this time could hinder the Debtor's Chapter 11 Case and jeopardize the Debtor's going-concern value. Accordingly, as set forth in the Wages Motion, the Debtor requests authority to continue paying the Employees and administering the Employee Benefit Programs and any obligations related to the foregoing (subject to the DIP Budget and any applicable payment caps) in the ordinary course of business.

58.    At this critical stage, the Debtor simply cannot risk the substantial disruption that would attend any decline in workforce morale or composition attributable to Debtor's failure to pay the Employee Obligations in the ordinary course of business.

59.    I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this Chapter 11 Case, and is critical to the Debtor's reorganization efforts. Accordingly, on behalf of the Debtor, I respectfully submit that the Wages Motion should be granted.

E.    **Motion for Authorization to (A) Continue Workers' Compensation, Liability, Property, and Other Insurance Programs, (B) Pay All Obligations in Respect Thereof and (C) Enter Into Premium Financing Agreements in the Ordinary Course of Business ("Insurance Motion")**

60.    Pursuant to the Insurance Motion, the Debtor seeks entry of an order authorizing (i) the Debtor (a) to continue its workers' compensation, liability, property, and other insurance programs, (b) to pay all obligations in respect thereof, and (c) to enter into premium financing agreements in the ordinary course of business, and (ii) financial institutions to honor and process checks and transfers related to such obligations.

61.    In the ordinary course of its business, the Debtor maintains a number of insurance polices that are administered by various third-party insurance carries. These policies provide coverage for, among other things, workers' compensation, automobile losses and liability, directors' and officers' liability, fiduciary liability, general liability, employee health,

employee dental, employee disability, and employee life insurance benefits. The Debtor is required to pay, either directly or through the Debtor's insurance brokers, premiums for coverage under these Insurance Programs. The Insurance Premiums are based upon a fixed rate established and billed by each Insurance Carrier. The premiums for most of the Insurance Programs are determined annually and are paid at the inception of each policy.

62.    Because it is not always economically advantageous for the Debtor to pay the Insurance Premiums on all of the Insurance Policies on a lump-sum basis, in the ordinary course of the Debtor's business, the Debtor finances the premiums on certain of its Insurance Policies pursuant to premium financing agreements with third-party lenders. In exchange for the financing, the Debtor agrees to pay monthly installments in accordance with a pre-set payment schedule and further grants the lender a security interest in "unearned premiums" to secure the payment obligations. As of the Petition Date, the Debtor believes that approximately $16,349.29 may be outstanding with respect to the current insurance premium financing agreements. Prior to the Petition Date, Debtor sent a check to Liberty Mutual for the monthly premium on workers compensation of $102,966 and a check to Flat Iron for $16,349.29 for the premium financing. To the extent these checks are not cashed prior to the Petition Date, Debtor seeks authority to honor these checks.

63.    The continuation of the Debtor's Insurance Policies and premium-financing agreements, as well as having the ability to renew or enter into new Insurance Policies and premium-financing agreements, is essential to the preservation of the value of the Debtor's business, properties, and assets. Moreover, in certain cases, coverage provided by the Insurance Policies is required by law, regulation, or contract.

64.    I believe that the relief requested in this motion is in the best interests of the

Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this Chapter 11 Case, and is critical to the Debtor's reorganization efforts. Accordingly, on behalf of the Debtor, I respectfully submit that the Insurance Motion should be granted.

**F.    Applications for Orders Authorizing Retention and Employment of KCC ("KCC") (i) as Claims and Noticing Agent, *Nunc Pro Tunc* to the Petition Date and (ii) Administrative Advisor *Nunc Pro Tunc* to the Petition Date (together, "KCC Retention Applications")**

65.    Pursuant to the KCC Retention Applications, the Debtor seeks entry of two orders: the first, approving the services agreement between the Debtor and KCC and the Debtor's appointment and retention of KCC as claims and noticing agent for the Debtor in lieu of the Clerk of the United States Bankruptcy Court for the District of Delaware, effective as of the Petition Date, and the second, approving a separate services agreement between the Debtor and KCC and the Debtor's retention of KCC as its administrative advisor (with respect to those services that exceed the scope of a Claims Agent) in this Chapter 11 Case. Accordingly, KCC's engagement is an effective and efficient manner of providing notice to the hundreds of creditors and parties in interest of the filing of, and developments in, the Debtor's Chapter 11 Case. Additionally, KCC will significantly reduce the administrative burden on the Clerk's office in connection with, among other things, the claims administration and plan confirmation processes. Further, retaining KCC as Administrative Advisor to perform the Administrative Services will allow the Debtor and its professionals to focus on key aspects of the Debtor's restructuring efforts. It is the Debtor's understanding that KCC is fully equipped and capable of performing the Administrative Services in addition to processing proofs of claim and handling the volume of mailing involved in properly sending the required notices to creditors and other interested parties in this Chapter 11 Case.

66.    I believe that the relief requested in the KCC Retention Applications is in the

best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this Chapter 11 Case, and is critical to the Debtor's reorganization efforts. Accordingly, on behalf of the Debtor, I respectfully submit that the relief requested in the KCC Retention Applications should be granted.

**G.    Motion for an Order Authorizing, But Not Directing, Payment of Prepetition Claims of Certain Critical Vendors ("Critical Vendor Motion")**

67.    By the Critical Vendor Motion, the Debtor seeks the entry of an order (i) authorizing, but not directing, the Debtor to pay, in its reasonable business judgment, the Critical Vendor Claims in an aggregate amount not to exceed (a) $150,000 on an interim basis and (b) $300,000 on a final basis; (ii) authorizing, but not directing, the Debtor to enter into Postpetition Trade Agreements as it deems appropriate in its business judgment; (iii) authorizing all banks and other financial institutions to receive, process, honor, and pay any and all checks presented for payment and electronic transfers with respect to payments authorized by this Motion, whether presented before or after the Petition Date, upon receipt by each bank and financial institution of notice of such authorization, provided that sufficient funds are on deposit in the applicable accounts; and (iv) granting such further and related relief as the Court deems just and proper.

68.    As set forth in the Critical Vendor Motion, the Debtor has identified 25 potential critical vendors owed $300,000 in the aggregate.

69.    Each of the Critical Vendors provides materials, components, or services that are vital to the Debtor's continued operations and ability to generate revenue and care for patients. In determining the amount of the Final Cap and whether a given vendor was a Critical Vendor, the Debtor consulted the appropriate members of its management team to identify those vendors essential to the Debtor's operations. The Debtor believes that, in some cases, other vendors cannot supply the required goods or services in sufficient quantity, quality, or reliability,

or on a cost-efficient or timely basis. Further, in certain other cases, the process of transitioning to a replacement vendor would take precious time and resources and could significantly disrupt the Debtor's operations. Under the circumstances, the Debtor believes that it does not have viable alternatives to obtain substitute goods or services from other sources. Consequently, to ensure the uninterrupted operation of its business, the Debtor seeks authority to pay all or a portion of the Critical Vendor Claims to the extent that the Debtor determines, in the exercise of its business judgment, that payment of such Critical Vendor Claims is necessary and appropriate to preserve its business.

70.    I believe that the relief requested in the Critical Vendor Motion is in the best interests of the Debtor's estate and creditors, is both necessary and appropriate to the efficient administration of this Chapter 11 Case, and is critical to the Debtor's reorganization efforts. Accordingly, on behalf of the Debtor, I respectfully submit that the relief requested in the Critical Vendor Motion should be granted.

**H.    Motion for an Order Finding that the Appointment of a Patient Care Ombudsman is Unnecessary in These Chapter 11 Cases ("Ombudsman Motion")**

71.    By the Ombudsman Motion, the Debtor seeks the entry of an Order (i) finding that the appointment of a patient care ombudsman is unnecessary in these Chapter 11 Cases, and (ii) granting to the Debtors such other relief as the Court deems just and proper.

72.    The appointment of a patient care ombudsman in these Chapter 11 Cases is unnecessary. The Debtors' industry is heavily regulated by state and federal authorities. The Debtors, as hospice-care providers, are required to comply with the regulations of the U.S. government and each state in which a Debtors operate.[3]    The Debtors are further subject to

---

[3]    As of the Petition Date, the Debtors operate in Arizona, Georgia, New Jersey, Oklahoma, Texas, and Virginia and therefore, must comply with the applicable rules and regulations.

monitoring and periodic inspection by several regulatory agencies and organizations including the Centers for Medicare and Medicaid Services ("CMS"), the Office of Inspector General ("OIG") of the United States Department of Health and Human Services ("HHS"), and the applicable state agencies and organizations in each jurisdiction in which the Debtors have facilities or operations. The Debtors are currently in compliance with the rules and regulations of each of these agencies and organizations and have not received any notice of delinquency or non-compliance from any such agency or organization.

73.     Moreover, the Debtors are subject to the terms and conditions set forth in that certain Corporate Integrity Agreement dated March 11, 2013 (the "Corporate Integrity Agreement") by and between the OIG and American Hospice Management Holdings, LLC ("AHM Holdings"). The Corporate Integrity Agreement was executed in connection with the settlement of certain disputes between the HHS and Debtor Hospice of Arizona ("HOA") relating to alleged violations of the False Claims Act, none of which implicated the level or quality of patient care the Debtors provide. The Corporate Integrity Agreement is designed to ensure the Debtors' compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other federal healthcare programs through certain enhancements to the Debtors' preexisting corporate compliance program (the "Compliance Program"). For example, the Corporate Integrity Agreement imposes additional disclosure, record-keeping, and reporting requirements including, among other things, the submission of annual, certified reports (a "Compliance Report") to the OIG concerning the implementation of, status of, and findings regarding, the Debtors' Compliance Program pursuant to the terms of the Corporate Integrity Agreement.

74.     The Debtors have timely submitted Compliance Reports in 2014 and 2015 and

are in the process of compiling their Compliance Report for the current reporting period.  The Debtors have been in compliance with their obligations under the Corporate Integrity Agreement since its execution.

75.    Certain of the Debtors operating in Texas, Virginia, and Arizona are licensed and accredited by the Community Health Accreditation Partner ("CHAPS").  The remaining Debtors are either certified or licensed by their respective states.  Licensing and accreditation of the Debtors involves providing a survey of the Debtors' programs to review their quality standards and performances, their adherence to both state and federal hospice regulations, and, to the extent any deficiencies are identified, a list of those deficiencies is presented to the Debtors and they are given a certain amount of time to write a plan of correction and work on processes to correct those areas.

76.    The Debtors also employ Dr. Kathi Cordingley.  Dr. Cordingley is the Debtors' Compliance Officer and the Director of Quality and Education.  Dr. Cordingley has a Doctor of Philosophy in Human Services with a specialization in Health Care Administration from Capella University.  Prior to working for the Debtors, Dr. Cordingley served as a Nursing Home Administrator, General Manager, Consultant, Executive Director, and Regional Director of Operations for numerous hospice companies.  Dr. Cordingley has worked in the hospice industry for 17 years and most recently served as the Director of the Elaine Wynn Palliative Care Program at Nathan Adelson Hospice in Las Vegas, Nevada, as the Hospice Care Quality Assurance Performance Improvement Manager for Davita/HCP/Las Vegas Solari, and as the Principal for Cordingley Hospice Consultants, LLC.

77.    In her role as Compliance Officer and as Director of Quality and Education, Dr. Cordingley: (1) ensures that any complaints are thoroughly investigated and resolved in an

23

unbiased nature; (2) identifies any quality of care issues by reviewing clinical records, patient surveys, or client reports and works to rectify and improve any deficient practices; (3) verifies the accuracy of claim submissions to protect the beneficiary's payor source; (4) ensures that patient care is performed as planned from admission to expiration through a review of clinical records; (5) verifies that the Corporate Integrity Agreement is adhered to by all parties obligated under the agreement; (6) educates all of the Debtors' employees regarding the Debtors' policies and procedures, Medicare billing practices, the Conditions of Participation for Hospice, and for CHAPS requirements; (7) educates the Debtors' employees on best practices and ensures that clinical, social, and spiritual standards of care are being met; (8) ensures that medications, durable medical equipment (i.e., oxygen concentrators, hospital beds, overbed tables, bedside commodes, etc.), supplies and services are being appropriately and accurately provided to patients, caregivers, and families for quality care; and (9) works proactively to ascertain if any conditions may adversely affect the patient, caregiver, or family and to put preventive processes in place.

78.     In addition to government regulation and oversight, the Debtors have a vigorous patient rights policy. Patient rights are included in a Family Guide that is hand delivered to each new patient with the patient or patient representative signing an acknowledgement that they have received, understood, and had the opportunity to ask any questions about patient rights. Virginia and Texas include another enclosure discussing the patient's rights that are specific to their respective states. Although there are some duplicities to this process, it ensures that the patient and their family understand the patient's rights. Further, as mentioned above, the Debtors maintain a comprehensive Compliance Program to ensure that the Debtors continue to provide patients and their families with high-quality, individualized hospice-care and related services.

Under the Debtors' Compliance Program, complaints are reviewed by the local programs and are logged into a complaint binder. There are specific policies in place on how to handle each complaint. The CEO/CFO of each Debtor also receives a weekly excel spreadsheet that lists any complaints lodged by either a patient or their family. As the Compliance Officer, Dr. Cordingley is made aware whenever there is a complaint that isn't simply that a hospice worker showed up late. The leadership at each of the Debtors' programs, the Clinical Director, and the Executive Director then respond to any complaint. Dr. Cordingley also assists in the resolution of any complaints when they are brought to her attention.

79.      Pursuant to the Compliance Program and the terms of the Corporate Integrity Agreement, the Debtors regularly check on the quality of the services provided to their patients through client reports and patient surveys. Patients are able to call a given Debtor if there are problems with the level of care received, and the Debtor has trained employees who respond to any patient complaints. Furthermore, the Debtors provide patients access to on-call physicians and other healthcare professionals after hours in the event that any patient requires emergency medical attention. Moreover, in the unlikely event that the Debtors' internal safe guards prove insufficient, patients are empowered to protect their rights and the quality of their care by lodging complaints with either the Debtors or any regulatory agencies that oversee the Debtors' operations. The OIG has previously represented that it is very comfortable with the Debtors' compliance program as well as Dr. Cordingley's role as the Debtors' Chief Compliance Officer.

I.      **Debtor's Motion to Dispose of Patient Records ("Patient Records Motion")**

80.      The Debtors collect and maintain patient records in the ordinary course of their business. The Conditions of Participation for record retention is for a term of six years from the death or the discharge of the patient. In the event the Debtors do not obtain relief under Section 351 of the Bankruptcy Code, they will be subject to substantial state and federal patient records

disposal requirements, as detailed herein.

81.     The Debtors must employ approximately one person per state to maintain their patient records.  At a cost of $38,000 per year per person for six states, the total personnel costs of maintaining the records total approximately $230,000 per year.  Additionally, the storage costs for maintaining patient records come to $5,000 per month.  As such, the total storage costs for the patient records total $60,000 annually.  Consequently, the total cost for maintaining the Debtors' patient records equals approximately $290,000 annually.

82.     The Debtors must inform agencies in each of the six states in which they operate and their Center for Medicaid Services ("CMS") regional office that they will be closing, where the Patient Records will be retained, how the Patient Records will be stored, and how the Patient Records can be accessed.  Additionally, Medicaid, the United States Veterans Administration, and commercial insurers must be notified in writing within 30 days of the Debtors' record retention process.  Further, most states require notification in writing within 30 days of the process for the retention, storage, and access of Patient Records.

83.     The federal government and each of the various state governments have their own storage requirements.  For example, physician records must be kept for seven years in Texas, ten years in Georgia, five years in Oklahoma, six years in Virginia, seven years in New Jersey, and six years in Arizona.  CMS contracts, claims, and annual reports must be kept for a total of five years.  Payroll, vendor invoices, leases, and legal claims must also be stored for five years.  Finally, personnel files, records for selection and hiring, and applicant records, must be stored for one year.

84.     Under a 2012 amendment to the Health Insurance Portability and Accountability Act of 1996, when a patient or a patient representative requests their patient records, the Debtors

the Debtors must provide notice to current patients regarding their records and the plan for storage, access, and maintenance if those patients are not transferred to another hospice provider. However, if the patient is transferred to another hospice provider their patient records must be sent to that provider.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

Respectfully submitted this _____day of March, 2016.

_____
Name: Scott Mahosky
Title:   Chief Executive Officer of the Debtors